UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDITH A. DAILY,

      Plaintiff,

v.

MARTIN TRANSPORTATION SYSTEMS, INC.,

      Defendant.
_____/

Case No. 1:12-cv-115

HON. JANET T. NEFF

**OPINION**

      Plaintiff Judith A. Daily (Plaintiff) filed this disability discrimination case against Defendant Martin Transportation Systems, Inc. (Defendant or MTS) after Defendant terminated her employment as a long-haul commercial truck driver. Now pending before the Court is Defendant's Motion for Summary Judgment (Dkt 82). Having conducted a Pre-Motion Conference in this matter and having now fully considered the parties' written briefs, statement of undisputed material facts and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court determines that Defendant's motion is properly granted.

**I.  BACKGROUND**

      Plaintiff was diagnosed with and began treatment for multiple sclerosis ("MS") in July 2008, when she was hospitalized following complaints of severe and continuous pain in the muscles of her arms, legs and feet; incontinence; loss in strength and muscle tone; and loss of feeling in her hands

(Statement of Material Undisputed Facts [SMUF]¹ ¶¶ 4, 6). Upon admission to the hospital, she had also reported a history of musculoskeletal problems, including multiple back surgeries, and she was hypertensive upon admission (*id.* ¶ 4). Upon discharge from the hospital, and at all times thereafter relevant to this proceeding, Plaintiff's prescribed treatment for her multiple sclerosis included weekly injections of the drug "Avonex" and daily use of the prescription pain medication "Tramadol" (*id.* ¶ 7). Plaintiff treated with Rodrigo Ubilluz, M.D., a neurologist (*id.* ¶ 8).

In September 2008, Plaintiff reported "having headaches on a daily basis, very intense 10/10, not throbbing, with some photophobia, but no phonophobia" (SMUF ¶ 10). As treatment for her reported headaches, Plaintiff received a prescription for Vicodin 5mg./500mg. (*id.* ¶ 11). Vicodin is the trade name for tablets containing hydrocodone bitartrate and acetaminophen, the first dosage number (5 mg.) referring to the amount of hydrocodone bitartrate and the second dosage number (500 mg.) referring to the amount of acetaminophen (*id.* ¶ 12). Vicodin is a prescription narcotic pain medication (*id.* ¶ 13).

In late July 2009, Defendant hired Plaintiff as an over-the-road truck driver (SMUF ¶ 14). Defendant provides just-in-time motor carrier services to customers, primarily in the North American automobile industry (*id.* ¶ 5). Defendant operates over-the-road tractor-trailer rigs with gross vehicle weights in the range of 80,000 pounds to transport automotive parts on behalf of its customers (*id.* ¶ 2). Plaintiff worked out of Defendant's terminal in Betrand, Missouri (*id.* ¶ 14). At the time of hire and throughout her employment with Defendant, her job consisted of driving a tractor-trailer rig to haul freight from a supplier and to Defendant's customer facility and to haul

---

¹Unless otherwise indicated, the Court has cited to those material facts stated by Defendant (Dkt 83-1) and admitted by Plaintiff (Dkt 90).

dunnage from Defendant's customer back to the supplier (*id.* ¶ 16). Each trip between the supplier location and Defendant's customer location required Plaintiff to drive several hundred miles, and then back again (*id.* ¶ 17). Plaintiff was required to drive the circuit two or three times in a week (*id.* ¶ 18). Her job required her to be on the road continuously for 4 to 6 days per week, depending upon the route and schedule, before returning to her home (*id.* ¶ 18).

After being offered employment with Defendant in July 2009, but before being permitted to drive, Plaintiff had a pre-employment medical examination with William C. Bryant, M.D., on or about July 24, 2009 (SMUF ¶ 20). As part of that medical examination, Plaintiff was required to complete a written health history questionnaire (*id.* ¶ 21; questionnaire is Ex. G, Dkt 84-3). Plaintiff did not disclose to Dr. Bryant that she had been diagnosed with or was treating for multiple sclerosis (*id.* ¶ 22). She did not disclose to Dr. Bryant that she had any history of musculoskeletal problems, back surgeries, blurred vision or hypertension (*id.* ¶ 23). Plaintiff did not disclose to Dr. Bryant the medications that she was taking in treatment of her multiple sclerosis (*id.* ¶ 24). Plaintiff did not disclose to Dr. Bryant that she was taking Vicodin (*id.* ¶ 25). Dr. Bryant provided Plaintiff with an unrestricted medical certification, medically qualifying her to drive as Defendant's employee (*id.* ¶ 26). On September 11, 2009, Plaintiff filled a prescription for 120 tablets of Vicodin 7.5/750 mg.; thereafter, she used that dosage of Vicodin as part of her treatment rather than Vicodin 5/500 mg. (*id.* ¶ 27).

Since being diagnosed with multiple sclerosis in 2008, Plaintiff's symptoms have progressively worsened (SMUF ¶ 28). On July 2, 2010, Plaintiff met with Dr. Ubilluz, her neurologist, who recorded in Plaintiff's medical records that Plaintiff reported "suffering from the

3

same symptoms she was suffering from before" (*id.* ¶¶ 29-30). He reported the following symptoms:

> She has constant numbness in her hands and legs. In the mornings her hands are useless. She cannot do anything with them, for they are numb.
>
> * * *
>
> The patient has been suffering from headaches, feeling like a stabbing pain in her head.
>
> * * *
>
> The patient suffers from diplopia and she has been constantly urinating.

(*id.* ¶ 30).

Defendant asserts that in July 2010, Mary Smith, the manager of Defendant's Bertrand terminal, learned that Plaintiff was treating for multiple sclerosis (SMUF ¶ 31). Plaintiff contends that other than telling a recruiter in the summer 2009, she herself told no one at work that she had been diagnosed with multiple sclerosis (*id.*). On Thursday, July 15, 2010, Smith notified one of Defendant's regional safety directors, Danny Southerland, that she had learned that Plaintiff had multiple sclerosis and was injecting herself with a drug as part of her treatment of that disease (*id.* ¶ 32). That same day, Southerland emailed Defendant's corporate safety director, Jeff Wood, and another regional safety director, Dave Mauro, reporting that he had been advised that a driver in the Bertrand terminal was treating for multiple sclerosis (*id.* ¶ 33).

On the morning of Friday, July 16, 2010, Mauro emailed a physician, Michael Berneking, M.D., asking whether a driver with a previously unknown diagnosis of multiple sclerosis could continue to drive or should be re-examined (SMUF ¶ 34). Dr. Berneking was the physician in charge of the clinic through which Defendant had its pre-employment driver physicals performed in Grand Rapids, Michigan (*id.* ¶ 35). By return email that same morning, Dr. Berneking advised Mauro that the driver should be removed from service pending re-examination and re-certification

4

(*id.* ¶ 36). On Friday afternoon, July 16, 2010, Plaintiff was informed that she had been taken out of service by Defendant's safety department (SMUF ¶ 37). On Saturday, July 17, 2010, Plaintiff spoke with Southerland, who informed her that she needed to be re-examined by a doctor (*id.* ¶ 38).

On the afternoon of Monday, July 19, 2010, Plaintiff was examined by David Pfefferkorn, M.D., in Sikeston, Missouri (SMUF ¶ 39). At the outset of the examination, Plaintiff completed and signed a health history form (*id.* ¶ 40, form is Ex. N, Dkt 85-5). In the health history Plaintiff provided to Dr. Pfefferkorn, she did not disclose her use of Vicodin, or her previously diagnosed hypertension, spinal problems, back surgeries or diplopia (*id.* ¶ 41). Dr. Pfefferkorn issued a one-year medical certification to Plaintiff (*id.* ¶ 42).

Defendant received Dr. Pfefferkorn's medical examination and certification report on the afternoon of Monday, July 19, 2010 (SMUF ¶ 43). Defendant also received the health history that Plaintiff completed immediately before the examination (*id.*). Defendant asserts that after reviewing Dr. Pfefferkorn's report, Corporate Safety Director Wood directed Mauro to terminate Plaintiff's employment for falsifying her 2009 medical health history (*id.* ¶ 44). Plaintiff contends that the failure to disclose portions of her medical history was a pretext for terminating her employment (*id.*). On Tuesday, July 20, 2010, Mauro notified Plaintiff that her employment was terminated because she had falsified her 2009 medical health history (*id.* ¶ 45). Defendant sent Plaintiff a confirming letter dated July 21, 2010 (*id.*).

On Tuesday, July 20, 2010, Meghan Bultema, a benefits coordinator for Defendant, terminated Plaintiff's company-sponsored health insurance coverage (SMUF ¶ 46). That same day, Bultema contacted Defendant's health insurance provider, Blue Cross Blue Shield, and canceled Plaintiff's health insurance benefits and asked that the cancellation be effective as of July 16, 2010

5

(*id.* ¶ 47). Defendant asserts that on and prior to July 20, 2010, its practice and policy was to request that a terminating employee's health insurance coverage be terminated effective as of the last day on which the terminating employee performed any compensable work (*id.* ¶ 48). Bultema determined that Plaintiff's last day of compensable work service was Friday, July 16, 2010, the last day she drove for Defendant (*id.* ¶ 49). Plaintiff contends that her Group Insurance Plan from Defendant identifies "termination of employment" as the qualifying event for continuing health care coverage, and she emphasizes that her employment was terminated on July 20, 2010 (*id.* ¶ 48).

Following the termination of her employment with Defendant, Plaintiff applied for and received unemployment benefits through the state of Missouri (SMUF ¶ 50). She ceased receiving unemployment benefits as of February 12, 2011 (*id.* ¶ 51). Plaintiff has not sought outside employment since she stopped receiving unemployment benefits (*id.* ¶ 52).

In October 2010, Plaintiff applied to receive Social Security Disability Insurance (SSDI) benefits as a source of income (SMUF ¶ 53). Defendant asserts that in her application for SSDI benefits, Plaintiff claimed that she was totally disabled from work by her multiple sclerosis and that the onset of her disability was July 20, 2010 (*id.* ¶ 54). Plaintiff emphasizes that no evidence has been submitted to suggest that she made the claim that her Alleged Onset Date (AOD) was July 20, 2010 (*id.*). The parties agree that the physician reports supplied with Plaintiff's application for SSDI benefits indicated that (1) Plaintiff suffered from "double vision and blurred vision;" (2) Plaintiff suffered from a lack of balance, that she had to hold onto a wall or furniture to get about, and that she "trips a lot;" (3) Plaintiff had experienced "low back pain for the past 10 years;" and (4) Plaintiff had been diagnosed with "degenerative disc disease" and had undergone a "lumbar fusion and

discectomy" (*id.* ¶¶ 55-58). Plaintiff was approved to receive the requested SSDI benefits, retroactive to January 2011 (*id.* ¶ 59).

On October 25, 2011, Plaintiff initiated this lawsuit. On November 20, 2011, Plaintiff filed an Amended Complaint, alleging the following six claims:

I. Unlawful Termination in Violation of the Americans with Disabilities Act

II. Impermissible Inquiry Regarding Plaintiff's Disability or Perceived Disability in Violation of the Americans with Disabilities Act

III. Unlawful Termination in Violation of the Michigan Persons with Disabilities Civil Rights Act

IV. Interference with a Right Protected under the Employee Retirement Income Security Act § 510

V. Breach of Fiduciary Duty under the Employee Retirement Income Security Act § 510

VI. Intentional Infliction of Emotional Distress

(Dkt 8). This Court conducted a Pre-Motion Conference with counsel in January 2013, at which time Plaintiff withdrew her tort claim in Count VI. The Court issued a briefing schedule on Defendant's proposed dispositive motion on the remaining claims (Dkt 74). Following an unsuccessful attempt in April 2013 to settle their case (Dkt 79), the parties filed their motion papers in May 2013 (Dkts 82-95).

## II. ANALYSIS

### A. Standard of Review

Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment has the initial burden of showing that no genuine

issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of an issue to be litigated at trial. *Slusher v. Carson,* 540 F.3d 449, 453 (6th Cir. 2008). The court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. Discussion

1. *Plaintiff's Discrimination Claims*

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, prohibits discrimination by a covered entity "against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ." 42 U.S.C. § 12112(a). Michigan's Persons with Disabilities Civil Rights Act (PDCRA), MICH. COMP. LAWS § 37.1201 *et seq.*, similarly prohibits an employer from "[d]ischarg[ing]" an individual "because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." MICH. COMP. LAWS § 37.1202(1)(b). Plaintiff alleges that Defendant violated both the ADA and the PDCRA by terminating her employment because she has multiple sclerosis and is, or is regarded as, disabled (Counts I & III). Plaintiff further alleges that Defendant also violated the ADA by requiring her to submit to a medical examination in 2010 (Count II).

A plaintiff may establish a violation of the ADA by either direct or circumstantial evidence. If, as here, a plaintiff seeks to establish her case indirectly, without direct proof of discrimination,

the plaintiff must state a prima facie case of discrimination by demonstrating that (1) she is an individual with a disability according to the statute; (2) she is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) the position remained open after the adverse employment decision or the disabled individual was replaced. *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001) (citing *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996), abrogated in part by *Lewis v. Humboldt Acquisition Corp, Inc.*, 681 F.3d 312 (6th Cir. 2012)).

If a plaintiff establishes a prima facie case, then "the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the challenged employment decision." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). "Should the employer carry this burden, then the burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was in fact a pretext designed to mask illegal discrimination." *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The plaintiff can defeat summary judgment only if her evidence is sufficient to create a genuine dispute at each stage of the inquiry. *Id.* Claims of disability discrimination under the state law essentially track those under federal law such that resolution of a plaintiff's claim under the federal statute also dispenses with a claim under the state act. *See Monette*, 90 F.3d at 1178, n.3; *Chmielewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998).

Defendant's motion at bar focuses on the second element of Plaintiff's prima facie case: her qualifications. The term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that

9

such individual holds or desires." 42 U.S.C. § 12111(8). The parties agree that at all times while Plaintiff was employed by Defendant, she and Defendant were subject to the Federal Motor Carrier Safety Regulations and Driver Qualification Rules codified in Parts 390 and 391 of Title 49 of the Code of Federal Regulations (SMUF ¶ 3). *See also King v. Mrs. Grissom's Salads, Inc.*, No. 98-5258, 187 F.3d 636, at *2 (6th Cir. 1999) ("Compliance with [Department of Transportation] safety regulations is an essential function of the job for a commercial driver."). The Department of Transportation, through the Federal Motor Carrier Safety Act (FMCSA), promulgated the Federal Motor Carrier Safety Regulations to establish the "minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers" and the "minimum duties of motor carriers with respect to the qualifications of their drivers." 49 C.F.R. § 391.1 (2013).

Defendant argues that Plaintiff cannot show that she was qualified for the driver position from which she was removed because she does not possess a valid medical certificate (Dkt 83 at 19). Plaintiff contends that "[t]here is no reasonable dispute that Plaintiff was qualified to perform her job on July 20, 2013" (Dkt 89 at 14). According to Plaintiff, "Defendant is unable to point to any authority that actually declared [her medical certificates] invalid other than its own unilateral determination" (*id.*). Plaintiff's argument is wholly without merit.

The FMCSA regulations instruct that a person is not permitted to drive a commercial motor vehicle unless she is "[i]s physically qualified to drive a commercial motor vehicle in accordance with subpart E—Physical Qualifications and Examinations of this part." 49 C.F.R. § 391.11(b)(4) (2013). Subpart E, in turn, provides that "[a] person subject to this part must not operate a commercial motor vehicle unless he or she is medically certified as physically qualified to do so …" 49 C.F.R. § 391.41(a)(1)(*i*) (2013).

10

A person is physically qualified to drive a commercial motor vehicle if (1) "[t]hat person meets the physical qualification standards in paragraph (b) of this section," and (2) that person "has complied with the medical examination requirements in § 391.43." 49 C.F.R. § 391.41(a)(3)(*i*) (2013). Hence, the stated purpose of obtaining a driver's medical history and performing a physical examination is "to detect the presence of physical, mental, or organic conditions of such a character and extent as to affect the driver's ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.43 (2013). The "Instructions for Performing and Recording Physical Examinations" mandate a medical examiner to "carefully" conduct the examination and "include all of the information requested in the following form" as the "[h]istory of certain conditions may be cause for rejection." *Id. See, e.g.,* 49 C.F.R. § 391.41(b)(7) (2013) ("A person is physically qualified to drive a commercial motor vehicle if that person . . . [h]as no established medical history or clinical diagnosis of . . . neuromuscular . . . disease which interferes with his/her ability to control and operate a commercial motor vehicle safely.").

The driver completing the Medical Examination Report must sign the form and certify that the information the driver provided is "complete and true," with the "understand[ing] that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate." 49 C.F.R. § 391.43 (2013). *See also* 49 C.F.R. § 390.35 (2013) (prohibiting employees of a motor carrier from making a "fraudulent or intentionally false statement on any application, certificate, report, or record required by . . . this subchapter").

Defendant's argument that Plaintiff was not a "qualified" driver under federal law is not based on whether she met the physical qualification standards in 49 C.F.R. § 391.41(b) (2013).[2] Rather, Defendant argues that Plaintiff was not a "qualified" driver under federal law because she had not complied with the medical examination requirements in § 391.43. Defendant asserts, and Plaintiff does not dispute, that Plaintiff twice falsified the medical history forms she was required to accurately complete to be qualified to perform her job.

First, in her July 2009 pre-employment medical history form, Plaintiff checked "No" to all of the Health History inquiries and therefore failed to disclose that she had been diagnosed with or was treating for multiple sclerosis and further failed to disclose her history of musculoskeletal problems, back surgeries, blurred vision and hypertension (Ex. G, Dkt 84-3). Plaintiff checked "No" to the inquiry about "Narcotic or habit forming drug use" and therefore failed to disclose her use of Vicodin (*id.*). In response to the instruction to "[l]ist all medications (including over-the-counter medications) used regularly or recently," Plaintiff responded "Ø" and therefore failed to also disclose the medications that she was taking in treatment of her multiple sclerosis—Tramadol and Avonex (*id.*). Plaintiff signed the form, certifying that she understood that the consequence of providing inaccurate, false or missing information would be the invalidation of her examination and her Medical Examiner's Certificate (*id.*).

Second, in her July 2010 medical history form, Plaintiff checked "Yes" to the Health History inquiry for "illness" and disclosed that she was diagnosed with multiple sclerosis in July 2008;

---

[2] As Defendant points out, "Plaintiff may or may not have been medically disqualified by her myriad health conditions and drug use, but we can never know because she frustrated all efforts to ascertain her medical qualifications by repeatedly and grossly falsifying her health history" (Def. Reply, Dkt 94 at 10).

however, Plaintiff checked "No" to the remainder of the inquiries and therefore again failed to disclose her previously diagnosed hypertension, spinal problems, back surgeries or diplopia (Ex. N, Dkt 85-5). Plaintiff disclosed Tramadol and Avonex as medications she used regularly or recently, but she again checked "No" to the inquiry about "Narcotic or habit forming drug use" and therefore again failed to disclose Vicodin as a medication she also used regularly or recently (*id.*). Plaintiff signed the July 2010 medical history form, again certifying that she understood that the consequence of providing inaccurate, false or missing information would be the invalidation of her examination and her Medical Examiner's Certificate (*id.*).

Defendant argues that by twice falsifying her medical history, Plaintiff rendered invalid the medical examiner's certificates that she received (Dkt 83 at 21). The Court agrees. There is no genuine factual dispute about Plaintiff's failure to obtain a valid medical examiner's certificate, and, without valid medical certification, Plaintiff was not a "qualified" driver under federal law when she was discharged from her employment. 49 C.F.R. §§ 391.11(b)(4) and 391.41(a)(1) (2013). *See, e.g., Cunningham v. USF Holland, Inc.*, No. 310141, 2013 WL 1748563, at *5 (Mich. Ct. App., April 23, 2013) (where a driver-employee does not meet federal medical qualifications to drive a commercial vehicle due to a disqualifying medical condition, he is not able to make out a prima facie case for discrimination under the PDCRA); *Dep't of Civil Rights ex rel. Lanphar v. A & C Carriers*, 403 N.W.2d 586, 590 (Mich. Ct. App. 1987) (same). Plaintiff cannot satisfy the second element of her prima facie case under the ADA and PWDCRA, to wit: proof that she is "'otherwise qualified' to perform the job requirements, with or without reasonable accommodation."

Plaintiff argues that summary judgment is nonetheless precluded because "whether MTS regarded Plaintiff [as] physically qualified [or] impaired creates a genuine, material issue for the trier

13

of fact" (Dkt 89 at 11-12). She opines that Defendant terminated her employment based on "myths and fears" associated with multiple sclerosis (*id.* at 16-18). Plaintiff's arguments are misplaced. Whether Plaintiff is disabled within the meaning of the acts, or was perceived as disabled under the federal act, implicates the first prong of her prima facie case, which is not at issue in the motion at bar. For purposes of its motion, Defendant conceded the first prong of Plaintiff's prima facie case (Dkt 83 at 19). Defendant's motion challenges the strength of Plaintiff's proofs in support of the second prong, the proposition that she is "otherwise qualified to perform the job requirements." Even assuming arguendo that Plaintiff can satisfy the first prong of her prima facie case, she cannot overcome Defendant's motion for summary judgment without also satisfying the second prong of her prima facie case.

Plaintiff also argues that because the inquiry into her health was not "proper," her false responses to the medical history questions should not preclude a finding that she is otherwise qualified to work as a long-haul commercial truck driver (Dkt 89 at 15-16). Plaintiff emphasizes that the ADA prohibits an employer from reviewing an employee's confidential medical file or requiring an examination in order to obtain information about a potential disability (*id.* at 19-21, citing 42 U.S.C. § 12112(d)). Plaintiff opines, in an attempt to assign error, that "the true purpose of the [July 19, 2010] exam was to determine if Plaintiff had M.S. and whether her M.S. limited her ability to perform the essentially [sic] functions of her employment" (*id.* at 21).

Plaintiff's argument is of no avail here. While the ADA prohibits some examinations and inquiries into disabilities, the act expressly permits examinations where an employer inquires "into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B) ("Acceptable examinations and inquiries"). As Defendant emphasizes, federal motor carrier safety

14

regulations not only permit inquiry under these circumstances, they require it: "Any driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease *must* be medically examined and certified as physically qualified to operate a commercial motor vehicle." 49 C.F.R. § 391.43 (2013) (emphasis added). Neuromuscular diseases, including multiple sclerosis, are recognized as potentially disqualifying under federal motor carrier safety regulations. 49 C.F.R. § 391.41(b)(7) (2013). The Court therefore agrees with Defendant that the regulations, in sum, require evaluation of the impact of multiple sclerosis on a driver's ability to safely operate a commercial vehicle, especially in this context, where the illness of which the employer has become aware was not disclosed or evaluated in the prior medical examination. Plaintiff's argument lends no support to maintaining either her "Impermissible Inquiry" claim (Count II) or her unlawful termination claims (Counts I & III).

Last, because Plaintiff has not established a prima facie case, this Court need not reach her argument that Defendant used her failure to disclose her multiple sclerosis as pretext for a discriminatory motive (Dkt 89 at 18-19) or her contention that she could "easily" establish pretext by the timing of the adverse employment action (*id.* at 21). The issue of pretext becomes relevant only if Plaintiff could establish a prima facie case, which she has not. *See also Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264, 272 (6th Cir. 2007) (holding that a truck driver's violation of federal regulations and dishonesty on medical forms amounted to a legitimate, non-retaliatory basis for his dismissal from his employment).

Defendant is entitled to judgment as a matter of law on Plaintiff's Counts I through III.

2. *Plaintiff's ERISA Claims*

Plaintiff alleges that Defendant interfered with her employee benefit rights in violation of § 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140 (Count IV) and breached its fiduciary duty under ERISA § 510 (Count V). The contours of Plaintiff's ERISA claims are, as Defendant characterizes them, "obscure" (Dkt 94 at 13). In her Amended Complaint, Plaintiff broadly alleges that she was denied participation in Defendant's health insurance benefits inasmuch as her "past and future anticipated claims for health benefits were a determining factor in the decision to terminate Plaintiff's employment" (Dkt 8, Amend. Compl. ¶ 50), and she assigns much weight to Defendant's change in its prescription drug program (Dkt 89 at 21-22). In her response to Defendant's motion, however, she more narrowly complains about the timing of her termination, i.e., that Defendant "used this information [about her diagnosis] to discriminate against the Plaintiff by suspending her benefits before MTS made the decision to terminate her employment" (Dkt 89 at 23). Plaintiff specifically complains that because her group health insurance was suspended on July 16, 2010, the bill for her July 19, 2010 blood work was not paid by the insurance company, a bill for which she is "still being pursued by a collection agency" (*id.*). Plaintiffs' ERISA claims, whether broadly or narrowly construed, also do not survive Defendant's motion for summary judgment.

Section 510 of ERISA provides, in pertinent part, that "[i]t shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit] plan." 29 U.S.C. § 1140. A plaintiff may establish a violation of ERISA § 510 by either direct or circumstantial evidence. *Schweitzer v. Teamster Local 100*, 413 F.3d 533, 537 (6th Cir. 2005)

16

(citing *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997)). If, as here, a plaintiff seeks to establish her case indirectly, without direct evidence that defendant had a specific intent to violate ERISA, the plaintiff must state a prima facie case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employer may become entitled. *Id.*

In addition, in submitting a claim under § 510, the plaintiff is required to demonstrate a "causal link" between the adverse employment decision and the loss of benefits. *Schweitzer*, 413 F.3d at 537 (citing *Ameritech, supra*). In particular, "in order to survive [a] defendant's motion for summary judgment, [the] plaintiff must come forward with evidence from which a reasonable jury could find that the defendants' desire to avoid [employee benefit] liability was a determining factor in [the] plaintiff's discharge." *Id.* (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1044 (6th Cir. 1992)). "Thus, unless the issue of benefits is shown to be causally linked to the employer's decision to terminate an employee, the termination decision will not violate § 510 of ERISA." *Id.* (citing *Mattei v. Mattei*, 126 F.3d 794, 808 (6th Cir. 1997) (requiring that under § 510, a plaintiff must produce evidence indicating a causal connection between a defendant's challenged action and its interference with plaintiff's ability to receive an identifiable benefit)).

Following the presentation of such evidence, the defendant is able to "rebut the presumption of impermissible action . . . by introducing 'evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Schweitzer*, 413 F.3d at 537 (citing *Humphreys*, 966 F.2d at 1043). The plaintiff must then show that the defendant's explanation was pretextual. *Id.* (citing *Ameritech, supra*). Summary judgment is appropriate if the plaintiff fails to establish a prima facie case or to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions. *Id.*

The Court agrees with Defendant that it is entitled to summary judgment of Plaintiff's ERISA claims in this case. Defendant's change in its prescription drug coverage does not alone constitute evidence from which a reasonable jury could properly find that a determining factor in Defendant's decision to discharge Plaintiff from her employment was a desire to avoid or reduce health care expenses. Moreover, Plaintiff "does not claim, much less prove, that MTS knew of the blood test which was left unpaid by the subsequently cancelled insurance. Nor does she claim or prove that the retroactive termination of her coverage was unique to her" (Def. Br., Dkt 83 at 30). To the contrary, as Defendant further points out, the undisputed evidence instead establishes that Defendant, as a matter of pre-existing practice and policy, terminated coverage retroactively for all terminated employees to the last date on which they performed compensable work (*id.*). The evidence pertaining to Plaintiff's ERISA claims does not require submission to a jury; rather, the evidence is so one-sided that Defendant must prevail as a matter of law. Defendant is therefore also entitled to judgment on Plaintiff's Counts IV and V.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt 82) is GRANTED. An Order will be entered consistent with this Opinion. Further, as the Order resolves all pending claims in this case, a Judgment will also be entered.


DATED: September 30, 2013        /s/ Janet T. Neff
                                                JANET T. NEFF
                                                United States District Judge